(C. D. 2004)

FASTENING DEVICES, INC.
ROHNER GEHRIG & CO., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 10, 1958)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Ford, Judge: The suits listed in schedule "A," hereto attached and made a part hereof, challenge the action of the collector of customs in classifying certain imported merchandise as manufactures of metal, not specially provided for, with the consequent levy of duty thereon at the rate of 22½ per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

Plaintiffs claim that said merchandise should be classified as nuts, nails, and studs, respectively, and assessed with duty at the appropriate rate under paragraph 330, 331, or 332 of said act, as modified, *supra,* or under paragraph 331 of the Tariff Act of 1930.

The paragraphs of the Tariff Act of 1930, as modified, *supra,* are as follows:

[397] Articles or wares not specially provided for, whether partly or wholly manufactured:

 * * * * * * *

 Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

 * * * * * * *

 Other (except slide fasteners and parts thereof) _____ 22½% ad val.

[330] Nuts, nut blanks, and washers, of wrought iron or steel_____ ³⁄₁₀¢ per lb.

[331] Nails, spikes, tacks, brads, and staples, made of iron or steel wire:
 Not less than one inch in length nor smaller than sixty-five one-thousandths of one inch in diameter_____ ³⁄₁₀¢ per lb.

[332] Rivets, studs, and steel points, lathed, machined, or brightened, and rivets or studs for nonskidding automobile tires_____ 15% ad val.

Paragraph 331 of the Tariff Act of 1930, *supra*, is as follows:

* * *; horseshoe nails, and other iron or steel nails, not specially provided for, 1½ cents per pound; * * *.

At the trial of this case, counsel for the plaintiffs offered the testimony of one witness and the following exhibits:

Collective exhibit 1, representative of item 625, invoiced as an eye coupling in protest 246664–K.

Collective exhibit 2, representative of item 626, invoiced as a coupling in protest 246664–K.

Collective exhibit 3, representative of item 627, invoiced as a coupling in protest 246664–K.

Collective exhibit 4, representative of item 628, invoiced as a coupling in protest 246664–K.

Collective exhibit 5, representative of item DP 300, invoiced as a drive pin in protest 248791–K.

Collective exhibit 6, representative of item DP 301, invoiced as a drive pin in protest 248791–K.

Collective exhibit 7, representative of item DP 302, invoiced as a drive pin in protest 248791–K.

Collective exhibit 8, representative of item DP 303, invoiced as a drive pin in protest 248791–K.

Collective exhibit 9, representative of item DP 305, invoiced as a drive pin in protest 248791–K.

Collective exhibit 10, representative of item DP 310, invoiced as a drive pin in protest 248791–K.

Collective exhibit 11, representative of item TS 101, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 12, representative of item TS 102, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 13, representative of item TS 103, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 14, representative of item TS 203, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 15, representative of item TS 204, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 16, representative of item TS 205, invoiced as a threaded stud in protest 248791–K.

Collective exhibit 17, representative of item 2229, invoiced as a machined stud in protest 252612–K.

Collective exhibit 18, representative of item DP 304, invoiced as a drive pin in protest 258323–K.

Collective exhibit 19, representative of item 2204, invoiced as a machined stud in protest 260139–K.

Counsel for the defendant offered and there was received in evidence as exhibit A a card with certain drive pins and threaded studs appearing thereon. There was also received in evidence, as exhibit B, one

sheet of paper which the witness described as "a piece of our literature," relating to the merchandise in question described as drive pins and as threaded studs. A 4-page booklet was admitted in evidence as exhibit C, which the witness described as "A piece of Remington literature," the front page of which is titled "The Model 450 Remington Stud Driver."

Counsel for the plaintiffs, in his brief filed herein, sets out the facts established by this record as follows:

* * * The imported merchandise was manufactured according to the plaintiff's specifications and, with the exception of the couplings, is made of steel wire and is cadmium plated to prevent deterioration. All of the fasteners, with the exception of the couplings, are designed to be driven into concrete or steel or any of the types of masonry that are used for buildings, such as red brick and mortar blocks. The items which are invoiced as studs are driven into this material only to the end of their shank so as to permit an attachment to the threaded portion of the stud which protrudes from the surface. The studs will hold over 1,200 pounds of direct pull down and can be used in any position.

Exhibits 5 through 9 and Exhibit 18 are used by the building trades for fastening materials together and function like a nail. It can be used in wood but is generally used to fasten a 2 x 4 studding to a steel beam or a piece of steel to a concrete wall. It is used to fasten wood either to metal or to concrete. The imported pins and studs have a shear strength, i. e., a resistance to drawing, of 1,280 pounds. The pins are used exclusively to fasten two or more pieces of material together. They can be driven into the material with a powder actuated gun which is accomplished by placing the pin in the barrel of the tool and placing a cartridge behind the pin. When the cartridge is exploded the expending gases drive the pin or stud down the barrel into the material which is to be fastened. The purpose of the plastic tip on the studs or drive pins is merely to hold them in place in the barrel. The plastic tip serves no other purpose and disintegrates when the drive pin or stud is driven into the material to be fastened. The drive pin, unlike the stud, completely penetrates the object into which it is being driven up to the head of the pin. Both the pins and studs can be inserted in the material which is to be fastened with the use of a hammer or very easily with the use of a hammer and a nail or stud holder. The latter tool holds the stud or pin in front of a plunger which is struck with a hammer. When the plunger is struck with a hammer it exerts the full force of the transmitted energy of the hammer through the plunger to the tip of the stud or pin and will cause the pin or stud to penetrate a piece of ¼ inch steel. When the drive pins are inserted with the use of a hammer or with a nail holder and hammer, the plastic tip serves no purpose and is thrown away. The hand driven method of inserting the pins and studs is used in the building trades by the smaller contractors because it is less expensive.

Exhibit 5 has a serration on its shank because it is designed primarily for use in steel. The serration increases its holding power. Exhibits 6 through 9 and Exhibit 18 are not serrated because they are used in cinder blocks, cement blocks, brick, concrete and mortar joints and do not require a serrated shank. Nails frequently are made with a serrated shank. There are many types of nails and steel nails are used in concrete.

Nails are made from steel which ranges from low cost steel up to a good grade of steel, depending upon the use of the nail. The drive pin's function is the same as the regular ten penny nail except that the drive pin is a better quality

product. Masonry nails could not be set into concrete and, consequently, it is necessary to have a better grade of steel in a nail which is driven into this material. They cost three or four times as much as a common nail but they look alike. The large size drive pins can be driven through a heavy piece of steel up to ¾ of an inch in thickness. Exhibits 5 through 9 and Exhibit 18 can be used for the same purposes as an ordinary nail, such as driving through wood or similar material but they are not used for insertion in this type of material because they are made of a better grade of steel and have a greater cost. Their general use is limited to fastening materials to steel, concrete and similar building materials simply because of their greater cost. Their function is the same as that of a nail and the witness stated that he considers them to be nails.

The studs as represented by Exhibits 10 through 16 and Exhibits 17 and 19 are manufactured the same way as the drive pins. Steel wire is machined to form the heads and the points. Thread is then rolled on the studs. The studs are then heat treated and plated. After importation these items are sold to the building trades as studs. Mr. Heintz testified that based on his experience in selling to the building trade that the term "stud" means anything that has a shank with a cylindrical top that is threaded so that a fastening can be made to it after the shank end is inserted in building material. After the studs are inserted there is always a threaded portion which protrudes. The threaded portion of the stud is then attached to anything that may be fastened to it. The stud may be used to secure a machine, for example, in which case the stud is placed in a concrete floor and the leg of the machine is fastened to the threaded portion of the stud which protrudes above the floor. The studs, like the drive pins, are inserted with powder actuated guns or they may be inserted manually with a hammer or with a nail or stud holder and a hammer.

Exhibits 1 through 4 are used in the same way that a nut is used. After the stud has been driven into a ceiling it may be extended down for the purpose of fastening a fixture or pipe rack. To accomplish this the coupling is screwed on to the stud. Exhibits 2 to 4 are hexagonal in shape and are used for holding purposes. The couplings are made of steel and after they are made, are plated with cadmium as a rust preventative just as studs and drive pins are coated. The couplings are manufactured by drilling a hole through a hex rod after which a tap is forced through the hex rod to form an internal thread.

The plaintiff sells masonry nails and other types of fasteners including the merchandise before the court to the building trades. In shape and design there is no difference between a masonry nail and a drive pin except that a masonry nail has a serration to give it additional holding power.

Exhibits 5 through 19 are made of a special alloy steel that gives them strength, whereas, a common nail would not be made of a high alloy steel.

\* \* \* \* \* \* \*

\* \* \* Exhibits 2, 3 and 4 are sold to the trade as couplings. They are used to join two threaded rods or two threaded pipes or for fastening small items together. Exhibit 4 has a different thread dimension on one end than on the other. Exhibit 1, the eye coupling, is designed to hold anything into position. \* \* \*

Counsel for the defendant appears to be in agreement with the factual situation as furnished by counsel for the plaintiffs, but calls attention to what he regards as nine additional pertinent factual phases of the record. An examination of the additional factual

phases of the record does not disclose any not set out by the plaintiffs, which we consider to be pertinent to a proper disposition of this case.

Based upon the facts, as set out above, counsel for the plaintiffs contends that items DP 301, DP 302, DP 303, DP 304, and DP 305, as represented by exhibits 6 through 9 and exhibit 18, are properly dutiable under the provisions of paragraph 331 of the Tariff Act of 1930, as modified by T. D. 51802, at 0.2 cent per pound as nails, made of iron or steel wire, not less than 1 inch in length nor smaller than sixty-five one-thousandths of 1 inch in diameter. In addition to the facts hereinbefore set out, the record established that the aforesaid items are made of steel wire, not less than 1 inch in length, and are not smaller than sixty-five one-thousandths of 1 inch in diameter.

Plaintiffs also contend that item DP 300, represented by exhibit 5, which the record shows is less than 1 inch in length, is greater than sixty-five one-thousandths of an inch in diameter, and is composed of steel, should be classified as steel nails, not specially provided for, and duty levied thereon at the rate of 1½ cents per pound under paragraph 331 of the Tariff Act of 1930.

Funk & Wagnalls New Standard Dictionary (1941) defines the term "nail" as follows:

nail, *n.* **4.** A piece of metal consisting of a slender body, shank, or tang, usually tapering toward or pointed at one end and having a head at the other end, used for driving into or through wood or other material to fasten one piece to another, or to serve as a projecting pin upon which things may be hung. * * *

Webster's New International Dictionary (1930 ed.) defines "nail" as follows:

nail, *n.* * * * **3.** A more or less slender, usually pointed piece of metal (rarely of wood—cf. TREENAIL), generally with a head intended to be struck by a hammer, used for driving into or through wood or other material to hold two or more pieces together, as a support from which pictures, etc., may be hung, or for ornamental purposes. Cf. BRAD, SPIKE, TACK. Nails are variously named from their use, shape, size, etc., as basket, boat, chair, clout, floor, shingle, chisel-pointed, corrugated, diamond, fourpenny (see PENNY), tenpenny, horseshoe, wrought, wire, cut, finishing, galvanized, tinned, upholsterer's, etc.

Counsel for the defendant insists in his brief filed herein that the subject merchandise is not dutiable as claimed by plaintiffs, for the reason that the evidence shows that it is composed of more than iron or steel, in that it is also plated with cadmium, and cites in support of such contention *D. C. Andrews & Co.* v. *United States,* 25 C. C. P. A. (Customs) 437, T. D. 49507; *M. W. Zack Metal Company* v. *United States,* 26 Cust. Ct. 91, C. D. 1306.

In a reply brief filed herein, counsel for the plaintiffs cites us to the case of *New York Trading Co.* v. *United States,* 47 Treas. Dec. 1107, Abstract 49575, wherein the subject merchandise consisted of nails

of steel, which had been dipped in brass, apparently for the purpose of preserving the steel, and were held dutiable as iron or steel nails, not specially provided for, under paragraph 331 of the Tariff Act of 1922. The attention of Congress was specifically called to the above decision when it was considering the Tariff Act of 1930. (Summary of Tariff Information, 1929, p. 715.) Yet, paragraph 331 of the Tariff Act of 1922 was reenacted without change as paragraph 331 of the Tariff Act of 1930. This we consider congressional approval of judicial construction and is a complete answer to the contention of counsel for the defendant.

The samples of the merchandise in question are potent witnesses. In appearance, the items presently being considered closely resemble many of the common, ordinary nails; they are used for driving into wood or other material to fasten one piece to another; they differ from the common, ordinary type of nails only in that they are made of a higher quality of material. A nail does not cease to be a nail simply because it is made of high-quality material. While it is true that many of these items are inserted or driven into material, such as wood, concrete, bricks and steel, by means of a powder-actuated gun, rather than by means of a hammer, this fact, in and of itself, would not be sufficient to deny these items of merchandise classification as nails. The method of inserting the nails does not change their character as nails. They are nails when driven manually, and they remain nails when driven by a powder-actuated gun.

Based upon the evidence in this record and for the reasons stated, we hold the items of merchandise, described on the invoices as DP 301, DP 302, DP 303, DP 304, and DP 305, to be properly dutiable at the rate of 0.2 cent per pound under paragraph 331 of the Tariff Act of 1930, as modified, *supra*, as alleged by the plaintiffs. Item DP 300, being less than 1 inch in length, we hold to be properly dutiable at the rate of 1½ cents per pound as iron or steel nails, not specially provided for, under paragraph 331 of the Tariff Act of 1930.

Plaintiffs claim the merchandise, described on the invoices as items 101, 102, 103, 203, 204, 205, 2229, and 2204, represented by exhibits 11 through 17, inclusive, and exhibit 19, and item DP 310, represented by exhibit 10, to be properly dutiable at the rate of 15 per centum ad valorem under paragraph 332 of the Tariff Act of 1930, as modified, *supra*, as machined studs. The record, heretofore set out, shows that these items are made of machined steel, so the only question presented is whether or not they fall within the common meaning of the term stud, as employed in said paragraph 332.

In *Gorman Anderson Corp.* v. *United States*, 34 Cust. Ct. 35, C. D. 1674, this court, in considering the common meaning of the term "stud," quoted the following definitions of that term:

The New Century Dictionary, volume two:

> **stud,** *n.* * * * A post or upright prop, as in the wall of a building; esp., one of the smaller vertical timbers, of the height of a single story, to which laths or boards are nailed in forming partitions or walls in houses; also, a boss, knob, nail-head, or other protuberance projecting from a surface or part, esp. as an ornament; also, a kind of small button or fastener, commonly of metal, bone, or the like and in the form of a small knob and a disk connected by a stem, used (when passed through small buttonholes or the like) for holding together parts of dress (as shirts) or for ornament * * *; also, any of various projecting pins, lugs, or the like on machines, etc.; * * *.

> * * * * * * *

Funk & Wagnalls New Standard Dictionary of the English Language (1942):

> **stud,** *n.* **1.** * * * **2.** A knob, round-headed nail, or other object forming a small protuberant ornament. (1) An ornamental button worn in a shirt-front or cuff. (2) A round-top nut for a stud-bolt. (3) An ear-like projection over which to draw and hold a lacing. (4) A hobnail.

Webster's New International Dictionary (1948):

> **stud,** *n.* * * * **1.** * * * **2.** A projecting knob, rod, pin or the like; esp., a kind of nail with a large head, used chiefly for ornament; an ornamental knob; a boss. **3.** A detachable buttonlike device, made in various forms, to be inserted through one or more buttonholes or eyelets and serve as a fastener, for ornament, etc.

After quoting the above definitions, among others, this court observed as follows:

> An examination of these definitions discloses that a stud may be used in machinery, carpentry, wearing apparel, and horology, among other purposes. In other words, it is apparent that studs may be used for a variety of utilitarian and ornamental purposes. An examination of the context of paragraph 332, *supra,* is also revealing since it indicates clearly that the term "studs" may include articles designed for utilitarian purposes as well as those intended for ornamental use. It will be observed that said paragraph 332, after enumerating "Rivets, studs, and steel points, lathed, machined, or brightened," provides further for "rivets or studs for nonskidding automobile tires." Their use for nonskidding automobile tires definitely indicates an exclusively utilitarian character. Since the provision for "Rivets, studs, and steel points" in the first part of paragraph 332 is not conditioned upon use, it was logically designed to embrace any products appropriately responding to the terms "Rivets, studs, and steel points."
>
> * * * * * * *
>
> In view of the broad application of the definitions of the noun "stud" to articles of wood, as well as of metal having multifarious uses, we are impelled to adopt the definition of the term "stud" which most aptly fits the subject merchandise.

This record shows that the subject items of merchandise are used by the building trades; that the shank end is inserted in steel or concrete or similar material, and the threaded portion of the item protrudes from the surface so as to permit of an attachment to be made; that the attachment, with the exception of item DP 310, would be made with a nut or coupling, which is screwed on to the threaded portion of the item. With item DP 310 the protruding

portion consists of a knob with a hole to which an attachment is made.

Based upon the established facts with reference to these items of merchandise and in harmony with the authority cited above, we hold the merchandise, invoiced as items 101, 102, 103, 203, 204, 205, 2229, and 2204, and item DP 310, to be properly dutiable at the rate of 15 per centum ad valorem under paragraph 332 of the Tariff Act of 1930, as modified, *supra*, as alleged by the plaintiffs.

Counsel for the plaintiffs contends in his brief filed herein that the merchandise, represented by items 625, 626, 627, and 628, exhibits 1 through 4, is properly dutiable at the rate of $\frac{3}{10}$ cent per pound under paragraph 330 of the Tariff Act of 1930, as modified by T. D. 51802, as nuts of steel. The record establishes that these items are composed of steel, so the only question presented is whether or not they fall within the common meaning of the term "nut," as employed in said paragraph.

These items are hexagonal in shape, with the exception of item 625, represented by exhibit 1, have internal screw threads, and are designed to be screwed on the threaded protruding portion of a stud or bolt for holding purposes. Items 626, 627, and 628 are approximately 1 inch in length and are internally threaded from end to end. Item 625 is approximately $1\frac{1}{2}$ inches in length and is round in shape for about one-half its length, this round portion being also threaded internally. The remaining one-half of this item appears to be of solid metal which has been flattened to dimensions of approximately $\frac{1}{2}$ inch in width by $\frac{1}{8}$ inch in thickness, with a hole approximately $\frac{1}{4}$ inch in diameter in this flattened portion.

Funk & Wagnalls New Standard Dictionary of the English Language defines the term "nut" as follows:

nut, *n.* 2. *mech.* One of various small parts, generally movable. (1) A block of metal having a hole in which a screw-thread has been cut, so that it may be fitted upon a bolt, screw or the like, and usually square or six-sided for convenience for turning with a wrench: * * *.

Webster's New International Dictionary defines the term "nut" as follows:

nut, *n.* 4. A perforated block (usually a small piece of *metal* of square or hexagonal section), with an internal, or female, screw thread, used on a bolt, or screw, for tightening or holding something, or for transmitting motion.

Webster's New International Dictionary (1930 ed.) also defines the term "coupling" as follows:

coupling, *n.* 1. Act of bringing or coming together; connection; specif., sexual union. 2. *mach.* A device or contrivance which serves to couple or connect adjacent parts or objects; as, a belt *coupling*, which connects the ends of a belt;

a car *coupling*, which connects the cars in a train; a shaft *coupling*, which connects the ends of shafts. See BOX COUPLING, CONE COUPLING. Illusts.

Based upon the facts in this case, including an inspection and examination of the samples in evidence, it is our view that the items being presently considered more nearly respond to the definition of a coupling, as set out above, than they do to the definition of a nut, and we so hold. These items are devices or contrivances which serve to couple or connect adjacent parts or objects.

To the extent indicated, the claims in these suits are sustained; in all other respects and as to all other merchandise, all the claims are overruled. Judgment will be rendered accordingly.